[Cite as *State v. Fox*, 2015-Ohio-3515.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Patricia A. Delaney, J. |
| -vs- | Case No. 14 CAA10 0065 |
| LARRY FOX | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Delaware County Court of
Common Pleas, Case No. 12CRI100409

JUDGMENT:    Affirmed in part, Reversed in part and
Remanded for Resentencing

DATE OF JUDGMENT ENTRY:    August 26, 2015

APPEARANCES:

For Plaintiff-Appellee    For Defendant-Appellant

CAROL HAMILTON O'BRIEN    WILLIAM T. CRAMER
Prosecuting Attorney    470 Olde Worthington Road, Suite 200
ERIC C. PENKAL    Westerville, Ohio 43082
Assistant Prosecuting Attorney
Delaware County Prosecutor's Office
140 North Sandusky Street
Delaware, Ohio 43015

*Hoffman, P.J.*

{¶1}   Defendant-appellant Larry M. Fox appeals his convictions and sentence entered by the Delaware County Court of Common Pleas. Plaintiff-appellee is the state of Ohio.

## STATEMENT OF THE FACTS AND CASE

{¶2}   At all times relevant herein, Appellant lived in a trailer park community in Lewis Center, Ohio.  Cory Tyo also lived in the same trailer park.  Tyo and Franklin Pyle commonly would hang out with Appellant and his brother, Harry Fox, at Appellant's trailer.  The group would often smoke marijuana and drink alcohol.

{¶3}   In October of 2012, Appellant gave Pyle money to buy marijuana.  Tyo testified he called a friend to obtain the marijuana, who came and picked him up and drove them to Columbus.  Tyo and Pyle gave the friend the money for the marijuana, but the friend never returned.  Tyo and Pyle called Appellant and his brother to come pick them up, explaining the money had been stolen and they were unable to buy the marijuana.  Appellant told Tyo he had a certain amount of time to pay him back.

{¶4}   On October 16, 2012, Pyle told Tyo Appellant wanted to speak with him. Tyo and Pyle went to Appellant's trailer.  Harry Fox, Patrick Mann and Courtney Caudill were there.   Appellant's two minor sons were also in the trailer.  Upon entering the trailer, Tyo observed a Nazi flag on the counter and "death metal" music playing.

{¶5}   About thirty minutes after they arrived, Tyo asked if he could go home, and Appellant got up and locked the door stating no one was leaving.  Appellant's brother, Harry Fox, then stated, "Court is now in session" and put a knife against Tyo's

throat.  Appellant told Tyo to stand up, and take off his shirt.  Appellant then handcuffed Tyo, and took off Tyo's pants.

{¶6}   Tyo was then set on the floor naked and handcuffed, with his hands behind his back. Appellant used a blow torch to heat a machete.  He then ran the machete through Tyo's hair, placed it on his back and touched his privates.  He threatened to cut off Tyo's private parts with the machete.  The behavior continued for a couple of hours, with Appellant questioning Tyo about his money and the drug deal.

{¶7}   Appellant then stood Tyo up, faced him towards a camera, put a knife to him and told him Tyo would perform "oral favors" or he would kill him.  Tyo testified he did not willingly participate, but did not have a choice.  Appellant pushed Tyo onto his knees, rubbed his genitals into Tyo's face and told Tyo if he hurt him or vomited, Appellant would kill him.  Tyo testified Appellant held the machete the entire time, and did not set it down.  Appellant then placed his erect penis in Tyo's mouth.  Tyo began to vomit, and asked for a trash can.

{¶8}   Appellant told Tyo he would have to perform sexual favors in order to repay him for the money stolen.  He then took Tyo to the back room of the trailer.  Appellant's minor son was in the room, and was told to leave.  Appellant testified after the minor child left, he and Appellant were alone in the room.

{¶9}   Appellant sat Tyo down on the bed, and put his erect penis into Tyo's mouth.  Appellant continued to hold the machete, and did not set it down. Tyo testified they were in the back bedroom for approximately thirty minutes.

{¶10} Following the incident, Appellant told everyone in the trailer to leave and not to speak of the incident or he would kill them.

{¶11} As a result, Appellant was indicted by the Delaware County Grand Jury on the following counts:

{¶12} Count 1:  Kidnapping, to terrorize or inflict serious physical harm, in violation of R.C. 2905.01(A)(3), a felony of the first degree;

{¶13} Count 2:  Kidnapping, to facilitate a felony, in violation of R.C. 2905.01(A)(2), a felony of the first degree;

{¶14} Count 3:  Kidnapping, to commit rape, in violation of R.C. 2905.01(A)(4), a felony of the first degree;

{¶15} Count 4:  Abduction by Force, in violation of R.C. 2905.02(A)(2), a felony of the third degree;

{¶16} Count 5: Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree;

{¶17} Count 6:  Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree.

{¶18} The kidnapping counts were reduced to felonies of the second degree as Appellant released the victim to a safe place, unharmed.

{¶19} Following a jury trial, Appellant was convicted of the charges as indicted.

{¶20} Via Judgment Entry of Sentence entered September 30, 2014, Appellant was sentenced as follows:

{¶21} As to Count 1, Kidnapping, to terrorize or inflict serious physical harm, in violation of R.C. 2905.01(A)(3), a felony of the second degree, a prison term of eight years,

**{¶22}** As to Count 3, Kidnapping, to commit rape, in violation of R.C. 2905.01(A)(4), a felony of the second degree, a prison term of eight years, to be served consecutive to the term imposed on Count 1,

**{¶23}** As to Count 5, Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree, a mandatory prison term of eleven years, to be served consecutive to the term imposed on Counts 1 and 3;

**{¶24}** As to Count 6, Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree, a mandatory prison term of eleven years, to be served consecutive to the terms imposed on Counts 1, 3 and 5;

**{¶25}** As to Count 4, Abduction by Force, in violation of R.C. , a felony of the third degree, the charge merged with Count 1, Kidnapping, to terrorize or inflict serious physical harm, as an allied offense of similar import, and is a lesser offense to the charge of kidnapping;

**{¶26}** As to Count 2, Kidnapping, to facilitate a felony, in violation of R.C. 2905.02(A)(2), a felony of the second degree, the charge merged with Count 3, kidnapping, to commit rape,  for purposes of sentencing.

**{¶27}** Appellant was further classified a Tier III Sex Offender Registrant pursuant to R.C. 2950.032.

**{¶28}** Appellant appeals, assigning as error:

**{¶29}** "I. THE TRIAL COURT VIOLATED PRINCIPLES OF DOUBLE JEOPARDY AND R.C. 2941.25 BY IMPOSING SENTENCE ON ONE COUNT OF KIDNAPPING THAT MERGED INTO THE RAPE COUNTS.

{¶30} "II. APPELLANT'S DUE PROCESS RIGHTS UNDER THE STATE AND FEDERAL CONSTITUTIONS WERE VIOLATED BECAUSE THE PROSECUTION FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT CONVICTIONS FOR TWO COUNTS OF KIDNAPPING."

I.

{¶31} In the first assignment of error Appellant maintains the trial court erred in failing to merge Count 3 Kidnapping to commit rape, with the rape charges.

{¶32} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This protection applies to Ohio citizens through the Fourteenth Amendment to the United States Constitution, *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), and is additionally guaranteed by the Ohio Constitution, Article I, Section 10. The Double Jeopardy Clause protects against three abuses: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

{¶33} Revised Code, Section 2941.25 reads,

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶34}** In *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court held,

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. *Blankenship,* 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the

defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

{¶35} Recently, the Ohio Supreme Court in *State v. Ruff,* 2015-Ohio-995, addressed the issue of allied offenses, determining the analysis set forth in *Johnson* to be incomplete. The Court in *Ruff,* held,

When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25(B).

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶36} Appellant concedes the first count of kidnapping in order to terrorize or inflict serious physical harm, in violation of R.C. 2905.01(A)(3), would not merge with the rape counts as the initial restraint had an independent significance apart from the rapes. Tyo was initially restrained for the purpose of interrogation and to terrorize him. A lengthy period of interrogation and torture occurred prior to the first act of rape.

{¶37} However, Appellant argues Count 3, kidnapping to commit rape, should merge with the underlying rape charges.[1] Specifically, Appellant maintains the ongoing restraint was incidental to the acts of rape, the detention was brief and the movement was slight, with no intervening moments of freedom. Appellant contends there was only one act of kidnapping throughout the entire incident in the trailer as the victim was never released.

{¶38} At trial herein, Tyo testified as to the events of the evening,

Q. What did he say and what happened?

A. He said court is now in session and then he put his knife against my throat.

Q. Were you sitting at the time?

A. Yes, sir, I was.

Q. And talk to us about those initial moments, what happened?

A. I don't really - - I just looked over at my buddy Patrick and he was just frozen and kind of like all the color was just drained from his face. I was scared, I didn't really know what to do. He told me to stand up, so I proceeded and I stood up and that's when Larry came from the bar with a

---

[1] Appellant concedes there are two separate acts of rape separated by time and space, and he could properly be sentenced on each count of rape.

machete and put it up towards my stomach and then they told my [sic] to take off my shirt and then he handcuffed me and then they took off my pants.

* * *

Q. No underwear, no nothing?

A. I had underwear on, boxers.

Q. Did they take that off at some point?

A. Yes, they did.

Q. And when you say they handcuffed you, where did they handcuff you?

A. Behind my back.

* * *

Q. Where did they put you, Cory?

A. They sat me down in the living room.

Q. All right.  In front of everybody?

A. Yes, sir.

Q. Was everybody that you mentioned earlier still there?

A. Yes, sir.

Q. When you say they sat you down, were you sitting Indian style, on your knees or something else?

A. Indian style.

Q. And you were naked?

A. Yes, sir.

Q. How did that make you feel?

A. Humiliated.

Q. Did you feel as though you could do anything?

A. Helpless.

Q. Why did you feel like that?

A. Everything was taken from me.  Like my life is now in someone else's hands.

Q. What specifically were they doing that made you feel like that?

A. Just trying to - - you know, they're just questioning me like they want answers, like it had something to do with him getting robbed.  He was just - - he had the machete in his hands telling me I can't say nothing to nobody.

Q. Who's he?

A. Larry Fox.

Q. He had a machete in his hands?

A. Yes, he did.

Q. And did he have anything else with him that day?

A. A blowtorch.

Q. Was he doing anything with that blowtorch and that machete?

A. Yeah.  He heated up the machete with the blowtorch and ran it through my hair and burnt it and you can smell it throughout the trailer.

Q. Is that a pleasant smell?

A. No, it wasn't.

Q. You say that he ran the machete through your hair?

A. Yes, sir.

Q. How often - - was that Larry that did that?

A. Yes, sir.

Q. And did he do that once, twice or?

A. He did it I believe about three times.

Q. Three times, okay.  It was Larry each time?

A. Yes, sir.

* * *

Q. Is your hair the only place that you were, that that knife was placed on you?

A. No, sir.  He heated up the machete again with the blowtorch and placed that on my back.

* * *

Q. From Mr. Fox, the defendant?  Did they put the knife and threaten you anywhere else on your body?

A. They put it on my private area.

Q. All right.  And what did they say?  What did he say?

A. He was just going to cut it off.

Q. Who?

A. Larry Fox.

Q. Threatening to cut your privates, your genitals off?

A. Yes, sir.

Q. How did that make you feel?

A. Real scared.  I mean I really couldn't do nothing.  I was helpless.

Q. So you guys were hanging out for about a half hour before this stated, it that correct?

A. Yes, sir.

Q. How long was this going on for?  Was this a five ten minute ordeal?

A. No.  Hours.  At least a couple hours.

Q. What sort of things were they asking you, telling you?

A. They asked me if I knew anything else, anything about him.  If I was part of the, of him getting robbed in the drug deal and him taking off and never coming back.

Tr. at 177-183.

**{¶39}** As to the second and third counts of kidnapping relative to kidnapping to commit a felony and kidnapping to engage in sexual activity, Tyo testified,

Q. At some point in time did Mr. Fox, Mr. Larry Fox change tactics?

A. Change what, sir?

Q. Did he change what he was doing?  Did he change - -

A. Yeah.  He stood me up and faced me towards a camera that was in his, camera facing the living room. He put his knife up to me and then he told me that I was going to give him oral favors and I was going to be willing to do it or else he was going to kill me.

Q. Was it mister - - was it the defendant that brought up oral favors?

A. Yes, it was Larry Fox.

Q. And you said something after that that you would do it willingly?

A. Yes. Only because he had a knife up against my throat and - -

Q. That's my point. Could you have said that you were doing this willingly?

A. Could I personally say that?

Q. No. at the time of the offense, did you ever say that you were doing it willingly?

A. Only when he made me to.

Q. What was the defendant wearing?

A. He's wearing jeans and a shirt, I think they were jean shorts.

Q. And so he stood you up, did he put you back down or did he stand you up for something else?

A. He put me back down.

Q. How did he put you down?

A. He put me on my knees.

Q. You were on your knees. Did he do anything with his genital area?

A. Yeah. He started like rubbing it in my face while I was on the ground and he took out his privates and said if I hurt him in any way or vomited or anything, that he was just going to kill me.

Q. Did he have a knife on him at the time he was doing this?

A. He had his machete the whole time, he never sat it down.

Q. When you say his privates, do you mean his penis?

A. Yes, sir.

Q. And at any point was his penis erect?

A. Yes.

Q. Where did he put his erect penis?

A. In my mouth.

Q. Did you do that willingly?

A. No, sir, I didn't.

* * *

A. I had to get the trash can, tell them to get me the trash can so I could vomit and he said if I get any on the floor, he was going to kill me or if I get any on him.

Q. Did you actually vomit?

A. Yes.  I don't know if it was like full vomit, it was like mucous and gag.

Q. When he was raping you, was there anything brought up, brought up about payments?

A. He said that's the only way I would be able to pay him off.

* * *

A. He said I would have to give him sexual oral favors to repay the debt since he thinks I had something to do with him getting robbed.

Q. Up to this point, was any of this voluntary?

A. No, sir, it wasn't.

Q. Were you still handcuffed?

A. Yes, sir, I was.

Q. And were you still naked?

A. Yes, sir. Yes.

Q. And what did you say in response to the payment discussion that he was having with you?

A. I mean I really didn't say nothing about it.

Q. Did you agree to a price or anything like that?

A. No.

Q. Not that you recall?

A. . . . No.

Q. At the certain point in time did he move you?

A. Yes, sir.  He took me to the back room of the trailer.

* * *

Q. And where did he move you to?

A. He took me down the hallway and then I'm pretty sure his son Jaiden was in here (indicating), so Jaiden had to come out and see everything that was happening to go back into his room right here (indicating) and then once Jaiden left, he continued and took me in here (indicating) into his room and sat me down by about right here (indicating).

Q. When you say he sat you down?

A. He threw me on his bed.  Face first.

Q. And . . . where did you land I guess?

A. He threw me down right about here (indicating) and I went long ways right here (indicating).

Q. And what happened next?

A. He, he grabbed me up, started putting his private on me, around my legs and my butt and then he stood me back up and then put me on the ground.

I, I don't want to say threw me but just kind of laid me down, you know what I mean, and then started raping me orally again like he did in the living room.  While continuing to hold his machete.

Q. Was he holding the knife the whole time?

A. Yes, sir, he was.

Q. Were you naked?

A. Yes, sir, I was.

Q. Was his penis erect?

A. Yes.

Q. And did, did his erect penis go into your mouth?

A. Yes, it did.

Q. How long were you in that back bedroom, Cory?

A. I would say probably about 30 minutes.  30, 40 minutes.

Tr. at 185-189.

In *State v. Logan*, 60 Ohio St. 2d 126, 134-35, 397 N.E.2d 1345, 1351-52 (1979), the Ohio Supreme Court held,

In formulating Ohio guidelines, we first note our disagreement with those states which require movement of the victim to sustain a conviction for kidnapping. The General Assembly has the power to define criminal offenses in any manner it chooses, so long as it does not violate pertinent constitutional provisions. We believe that prolonged restraint without asportation may be as penologically significant as substantial asportation and, under certain circumstances, will support a conviction for kidnapping as a separate act or animus from that of rape.

Secret confinement, such as in an abandoned building or nontrafficked area, without the showing of any substantial asportation, may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense.

*The primary issue, however, is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense. In the instant case, the restraint and movement of the victim had no significance apart from facilitating the rape. The detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape. In such circumstances, we cannot say that appellant had a separate animus to commit kidnapping.*

We adopt the standard which would require an answer to the further question of *whether the victim, by such limited asportation or restraint, was subjected to a substantial increase in the risk of harm separate from that involved in the underlying crime*. If such increased risk of harm is found, then the separate offense of kidnapping could well be found.\*\*\*

(Emphasis added.)

**{¶40}** Upon review of the evidence presented at trial, we find the offense of kidnapping charged in Count 3 (kidnapping to commit rape) was an offense of similar import to the charge of rape that occurred in the bedroom. This kidnapping to commit rape charge did not cause a separate identifiable harm to the victim from that of the actual rape itself. The kidnapping was incidental to commission of the second rape and was not committed with a separate animus. Accordingly, pursuant to *Johnson* and *Ruff*, supra, we find the charges are allied offenses of similar import. We find the analysis set forth by the Ohio Supreme Court in *Logan* supports this conclusion.

**{¶41}** Within Appellant's first assignment of error, he argues all three kidnapping counts should merge together because there was only one continuous period of restraint. We note Appellant did not separately assign this as error in compliance with App. R. 16. Accordingly, we will not address the argument on the merits. We note the trial court merged the second count of kidnapping with the third count of kidnapping. Given our finding the third count of kidnapping merges with the last rape count, we would find this argument is moot.

**{¶42}** Appellant's first assignment of error is sustained.

II

{¶43} In the second assignment of error, Appellant argues his state and federal constitutional rights were violated because there was insufficient evidence to support three separate counts of kidnapping. Given our disposition of Appellant's first assignment of error and the trial court's merging of count two kidnapping with count three kidnapping, we find this assignment moot.

By: Hoffman, P.J.

Wise, J. and

Delaney, J. concur